

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

**DECISION AND ORDER**

SEAN MCINDOO a/k/a Professor,

1:15-CR-00142 EAW

Defendant.

## I.   BACKGROUND

Defendant Sean McIndoo a/k/a Professor (hereinafter "Defendant" or "Mr. McIndoo") seeks revocation of the magistrate judge's detention order pursuant to 18 U.S.C. § 3145(b). (Dkt. 251). Defendant is one of 16 defendants[1] named in a 46-count Second Superseding Indictment (Dkt. 33) (hereinafter "Indictment") returned on March 16, 2016, that alleges various crimes, including a RICO[2] conspiracy in violation of 18 U.S.C. § 1962(d), firearm offenses in violation of 18 U.S.C. § 924(c), and various

---

[1]   The Government sought detention of all 16 defendants in this case. Magistrate Judge Roemer ordered the release on conditions of five of the defendants (*see* Dkt. 99, 103, 144, 162, 263), and this Court revoked a magistrate judge's detention order and ordered the release on conditions of another defendant (Dkt. 224), so that six of the defendants have been released on conditions. The remaining ten defendants are presently detained, including two defendants who have entered guilty pleas. (*See* Dkt. 257, 296).

[2]   "RICO" refers to the Racketeer Influenced and Corrupt Organizations Act, codified at 18 U.S.C. §§ 1961-1968.

VICAR[3] counts, pertaining to the operation of the Kingsmen Motorcycle Club ("KMC").

Defendant is named in the following six counts:

(1)      Count 1 (RICO conspiracy) in violation of 18 U.S.C. § 1962(d);

(2)      Count 2 (possession of firearms in furtherance of crime of violence) in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2;

(3)      Count 14 (attempted murder in aid of racketeering) in violation of VICAR, 18 U.S.C. §§ 1959(a)(5) and 2;

(4)      Count 15 (assault with a dangerous weapon in aid of racketeering) in violation of VICAR, 18 U.S.C. §§1959(A)(3) and 1959(A)(6) and 2;

(5)      Count 16 (use and discharge of a firearm during and in relation to a crime of violence) in violation of 18 U.S.C. §§ 924(c)(1)(a)(iii) and 2;

(6)      Count 45 (using and maintaining the KMC South Buffalo Chapter's clubhouse for drug dealing) in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2; and

(7)      Count 46 (possession of firearms in furtherance of drug trafficking) in violation of 18 U.S.C. § 924(c)(1)(A)(i) and 2.

(Dkt. 33).

Defendant was arrested and subsequently arraigned on March 22, 2016, in the United States District Court for the Middle District of Florida (Orlando Division). A Pretrial Services Report prepared by that District's Probation Office concluded that Defendant presented both a risk of nonappearance and a danger due to his illicit drug use, mental health issues, possession of a passport, and the nature of the charges, and

---

[3]      "VICAR" refers to the Violent Crimes in Aid of Racketeering Activity statute, codified at 18 U.S.C. § 1959.

recommended that Defendant be detained pending trial.  Defendant waived his right to a detention hearing in the Middle District of Florida, pending removal to this District.

On April 11, 2016, a detention hearing was held before United States Magistrate Judge Roemer in this District, who also received a memorandum from this District's Probation Office agreeing with the recommendation of detention from the Middle District of Florida.  At the detention hearing before Magistrate Judge Roemer, the Government proceeded by proffer.  Defendant proceeded by both proffer and by direct evidence in the form of his own sworn testimony.  (Dkt. 168).

On April 14, 2016, Magistrate Judge Roemer issued an Order of Detention.  (Dkt. 102).  Magistrate Judge Roemer determined that Defendant had "come forth with some evidence to rebut the presumption of detention," (*id.* at 3), but that "no condition or combination of conditions will reasonably assure the defendant's appearance as required, and . . . that no condition or combination of conditions will reasonably assure the safety of any other person and the community," (*id.*).  Magistrate Judge Roemer based his conclusions, in part, on his findings that Defendant's testimony at the detention hearing was not credible.  (*Id.* at 6).

On August 4, 2016, Defendant moved to revoke Magistrate Judge Roemer's Detention Order pursuant to § 3145(b).  (Dkt. 251, 255).  The Government responded on August 15, 2016.  (Dkt. 266).  On August 19, 2016, a motion hearing was held before this Court, and the Government proceeded by proffer.  (Dkt. 274).  The Government presented exhibits as part of its proffer, denominated by Government Exhibits 1 through 16.  At defense counsel's request, the matter was adjourned to allow Defendant sufficient

time to continue his preparations for the hearing, and the hearing continued on August 29, 2016. (Dkt. 282). Prior to the continuation of the hearing on August 29, 2016, the Government filed supplemental papers in further opposition to Defendant's motion. (Dkt. 281).

At the hearing on August 29, 2016, Defendant proceeded by proffer and also presented testimony from his father, Daniel McIndoo. Defendant introduced Exhibit A at the hearing. The Government and Defendant presented further arguments, and at the conclusion of the hearing, the Court reserved decision and set a schedule for any further submissions. Specifically, the Court set September 6, 2016, as the deadline for Defendant to submit any further information, including responding to the Government's supplemental submission, with any response from the Government to be served by September 7, 2016. (Dkt. 282).

On September 6, 2016, counsel for Defendant communicated with the Court by letter indicating that he did not intend to submit any further legal arguments, and also expressing his objection to recently disclosed information that the Government had notified him about on "Friday, September 2, 2016, at 4:48 p.m." At the time the Court received the letter, it had not been made aware of this additional information by the Government, but the following day, on September 7, 2016, the Government moved to supplement the detention hearing record with this additional evidence. (Dkt. 295). The Court set a deadline of September 14, 2016, for Defendant to file any papers in response. (Dkt. 297). Defendant did not file any papers in opposition and the Court granted the Government's motion to supplement the record. (Dkt. 303).

- 4 -

## II.    **LEGAL STANDARD**

The Bail Reform Act of 1984, 18 U.S.C. §§ 3141 *et seq.*, authorizes and sets forth the procedures for the release or detention of a person pending trial, sentence, and appeal. The procedures and standards for release or detention of a person pending trial are set forth at 18 U.S.C. § 3142.  A defendant awaiting trial must be released unless the release will present a risk of flight or danger, or both, and no set of conditions can reasonably protect against those risks. *See United States v. Berrios-Berrios*, 791 F.2d 246, 250 (2d Cir. 1986) (explaining that the Bail Reform Act codified "traditional presumption favoring pretrial release for the majority of Federal defendants" (quotation omitted)).

Although there is "only a limited group of offenders who should be denied bail pending trial," *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007) (citations and quotations omitted), when there is a "a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate," *United States v. Chimurenga*, 760 F.2d 400, 403 (2d Cir. 1985) (quotations omitted).

In this case, due to the nature of the charges against Defendant, there is a rebuttable presumption pursuant to 18 U.S.C. § 3142(e)(3) that no condition or combination of conditions will reasonably assure the appearance of Defendant and the safety of the community if Defendant is released. *See also United States v. Contreras*, 776 F.2d 51, 54-55 (2d Cir. 1985) (holding that a grand jury indictment establishes probable cause for purposes of the rebuttable presumption under the Bail Reform Act, and when faced with an indictment, the Court does not need to make an independent

finding of probable cause).  The presumption shifts to Defendant "a limited burden of production – not a burden of persuasion – to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).  "[A] defendant must introduce some evidence contrary to the presumed fact[s] in order to rebut the presumption." *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991).  If a defendant satisfies this burden of production and rebuts the presumption, it does not disappear; rather, the presumption "remains a factor to be considered among those weighed by the district court." *Mercedes*, 254 F.3d at 436.

Even in a presumption case, however, at all times the government retains the ultimate burden of persuasion.  The burden of proof with respect to risk of flight is preponderance of the evidence.  *Id.*  On the other hand, the government must demonstrate by clear and convincing evidence that a defendant should not be released due to his risk of danger.  *Chimurenga*, 760 F.2d at 405.  Clear and convincing evidence "means something more than 'preponderance of the evidence,' and something less than 'beyond a reasonable doubt.'"  *Id.*  In other words, the evidence must support a conclusion of danger to the community "with a high degree of certainty."  *Id.*

The statutory factors that a court must consider in deciding whether a defendant has rebutted the presumption of flight and danger, and whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, are as follows:

(1)     the nature and circumstances of the offense charged, including whether the offense is a crime of violence, . . . or involves . . . a controlled substance, firearm, explosive, or destructive device;

(2)     the weight of the evidence against the person;

(3)     the history and characteristics of the person, including—

    (A)     the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

    (B)     whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4)     the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g); *see also Mercedes*, 254 F.3d at 436 ("To determine whether the presumptions of dangerousness and flight are rebutted, the district court considers . . . [the factors set forth at] § 3142(g).").

In reviewing a detention order of a magistrate judge, a district judge should not simply defer to the judgment of the magistrate judge, but rather must reach her own independent conclusions. *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985). "When making its *de novo* review, the district court may rely on the record of the proceedings before the magistrate judge and may also accept additional evidence." *United States v. Marra*, 165 F. Supp. 2d 478, 481 (W.D.N.Y. 2001).

## III.   ANALYSIS

Based upon its review of the record and the factors set forth in § 3142(g), including consideration of the rebuttable presumption of flight and danger, the Court concludes that the Government has established by a preponderance of the evidence that Defendant presents a flight risk, but there may be conditions that would reasonably protect against that risk.  However, because the Government has established by clear and convincing evidence that Defendant's release would endanger the safety of any other person and the community, and no condition or combination of conditions will reasonably protect against those risks, Defendant's motion to revoke the magistrate judge's detention order (Dkt. 251) is denied.

### A.   NATURE AND CIRCUMSTANCES OF THE OFFENSES CHARGED

Defendant is charged in six separate counts with some very serious crimes, including a RICO conspiracy allegedly involving a pattern of racketeering activity with predicate acts of murder, robbery, kidnapping, drug trafficking, and obstruction of justice, and two separate VICAR counts purportedly involving attempted murder and assault. Defendant is also charged with three firearm offenses in violation of § 924(c).

Defendant is alleged to have served in the role of "Nomad" for KMC, an alleged one-percent motorcycle club[4] aimed at engaging in criminal activity that allegedly

---

[4]   A one-percent motorcycle club is one that is not law abiding; the term is "derived from an American Motorcycle Association official's remark in the 1950s that 99 percent of all bikers were law-abiding, and thus 'only' one percent of the motorcycles on the roads belonged to persons who were trouble-makers." *Piscottano v. Murphy*, 511 F.3d 247, 255 (2d Cir. 2007).

preserved and protected its power through intimidation, violence, threats of violence, assaults, murder and attempted murder.  According to the Indictment,

> [a] KMC Nomad was a KMC member who was not required to regularly attend all of the enterprise's meetings and other events, but was expected to serve the interests of the KMC enterprise, including fighting other clubs and committing violent crimes on behalf of KMC.  The KMC Nomads answered only to the National President, or Regional Presidents passing down orders to the Nomad President from the National President.

(Dkt. 33 at ¶ 7).

Defendant is named in the following overt acts alleged as part of the RICO conspiracy:

- Sometime before July 25, 2013, defendant Edgar Dekay II called Victim C, a former Kingsmen, and a person known to the Grand Jury, and demanded his KMC patches.  Later, that same day, four KMC members, including defendant Sean McIndoo, went to Victim C's house to demand his KMC patches (Dkt. 33 ¶ 20);

- On or about August 3, 2013, defendants Edgar Dekay II, Gregory Willson, Thomas Koszuta, and Sean McIndoo and others removed the seats to defendant Jack Wood's van, loaded shotguns into the van, and drove to Springville, New York, to confront dismissed KMC members who were believed to be loyal to a former KMC national president (*id.* ¶ 21);

- On or about August 3, 2013, defendant Edgar Dekay, II, Gregory Willson, Thomas Koszuta, and Sean McIndoo, and another person known to the Grand Jury drove to the vicinity of the former Springville Chapter clubhouse and fired a shotgun from the van at several former Springville KMC members and associates who were standing outside the former Springville Chapter clubhouse (*id.* ¶ 22); and,

- Beginning on a date unknown, but starting no later than the year 2006, and continuing to the date of the return of the . . . Indictment, ALL defendants maintained the premises known as the South Buffalo Chapter Kingsmen clubhouse located at 846/850 East Eagle Street, Buffalo, New York, to use, maintain, and distribute controlled substances, including cocaine and marijuana (*id.* at ¶ 87).

On the § 924(c) counts alone, Defendant faces a potential penalty of life in prison, and if convicted on all three § 924(c) counts, a potential mandatory minimum 55-year term of imprisonment, to be served consecutively to any other sentence imposed. For the RICO conspiracy count, Defendant faces a potential maximum penalty of 20 years in prison, and maximum penalties of 10 to 20 years on the VICAR counts.

## B.   **WEIGHT OF THE EVIDENCE**

### 1.   Springville Shooting & Victim C

The most serious incident with which Mr. McIndoo is alleged to have been personally involved relates to the alleged shooting and attempted murder that occurred on August 3, 2013, a few months after Mr. McIndoo had been made a Nomad by either Mr. Pirk or Mr. Haley.[5] This incident serves as the basis for the two VICAR counts charged against Mr. McIndoo (counts 14 and 15), as well as one of the § 924(c) charges (count 16). It also is the basis for most of the overt acts involving Mr. McIndoo that are referenced in the RICO conspiracy charged in count 1.

---

[5]      In the proceedings before this Court and Magistrate Judge Roemer, there was a dispute as to whether it was Tim Haley or co-defendant David Pirk who made Mr. McIndoo a Nomad. According to the FBI's report of its interview with Mr. McIndoo on November 5, 2015, prepared on an FD-302 form and marked during the proceedings before this Court as Government Exhibit 11, Mr. McIndoo told the FBI that Mr. Pirk selected him to become a Nomad in 2013, at or around the time that the KMC Springville Chapter clubhouse was shut down and at a time when Mr. McIndoo was residing in Florida. During Mr. McIndoo's testimony before Magistrate Judge Roemer, Mr. McIndoo denied that Mr. Pirk made him a Nomad, and he denied telling the FBI this information; instead testifying that Mr. Haley made him a Nomad. (Dkt. 168 at 63-64, 93-94). During Defendant's proffer to this Court, he contended that both Mr. Pirk and Mr. Haley were present during his elevation to Nomad status.

Regardless of who made Mr. McIndoo a Nomad, there does not appear to be any dispute that it occurred in June 2013. (Dkt. 251-1 at 14).

According to the Government's proffer, on August 3, 2013, Mr. McIndoo was attending a party at co-defendant Jack Woods' house with other KMC members, when they received a photograph, sent electronically, depicting former KMC members who were involved in their own party at the former KMC Springville Chapter clubhouse. According to the Government's proffer, the KMC Springville Chapter had been shut down for its failure to abide by the directions of KMC National President, co-defendant David Pirk. These former KMC members were aligned with the former KMC National President Skeet Spry. The photograph sent on August 3, 2013, depicted these former KMC members wearing KMC colors or patches,[6] even though they were no longer KMC members.

In response to this perceived taunt, Mr. McIndoo and other KMC Nomads, including co-defendants Edgar Dekay, II, Gregory Willson, and Thomas Koszuta, loaded into Mr. Woods' van with at least one firearm, and they drove to the former KMC Springville Chapter clubhouse (a distance of approximately 26 to 28 minutes). Upon arriving at the location, at least two gunshots were fired from the van, and one of the shots hit a parked vehicle near where an individual identified in the Indictment as "Victim C" was standing. The vehicle was occupied by a woman who was passed out.

There is conflicting testimony as to whether Mr. McIndoo was the shooter, but all the evidence presented to the Court indicates that at a minimum, Mr. McIndoo was

---

[6]     The Indictment alleges that KMC members wore leather vests or jackets with the KMC emblem on the back and other symbols such as rank and club location. (Dkt. 33 at ¶ 11). These vests "were commonly referred to as 'colors' or 'patches.'" (*Id.*). "The KMC 'colors' and 'patches' were distinctive to the KMC, and were items of significant value to the KMC and KMC members." (*Id.*).

present in the van.  Indeed, while Defendant attempted to minimize the significance of any danger associated with this incident, he made no real effort during either the appearance before this Court or before Magistrate Judge Roemer to contest his involvement in this incident.[7]

With respect to the individual identified as Victim C, according to the Government's proffer, just over a week prior to the Springville shooting, on July 25, 2013, Mr. McIndoo and other KMC Nomads went to Victim C's house and demanded the return of his patches.  Ultimately the police were called to the scene and no violence ensued.  The police de-escalated the situation and negotiated the return of the patches, although when and whether the return actually occurred is unclear.  The Government suggested during its proffer that Victim C was displaying his patches in the photograph that prompted the shooting on August 3, 2013, thus suggesting that at least as of that date, the patches had not been returned.

Defendant stressed during his proffer that the Government had no evidence and had not even claimed that violence occurred during the visit to Victim C's house on July 25, 2013, and furthermore, Victim C was anything but a victim, apparently having his own legal troubles.  Defendant further argued as part of his proffer that it was not a "big deal" that Mr. McIndoo and others showed up at Victim C's house, and indeed, this very

---

[7]       By no means is the Court suggesting that Mr. McIndoo has admitted that he was involved in the incident.  In fact, Mr. McIndoo denied any knowledge of the incident when interviewed by the FBI in November 2015, even going so far as to deny knowing any individual named Jack Wood or attending a party at his house, prompting the FBI agents to advise Mr. McIndoo that it is a federal crime to knowingly lie to a federal investigator during the course of an investigation. (*See* Gov't Ex. 11).

same scenario played out with Mr. McIndoo when he left the KMC in April 2014 (suggesting that a house call to collect patches was really just a normal occurrence when a departing member left the KMC).[8]

## 2. Supplier of Firearms and Drugs

The Government contends that the evidence concerning Mr. McIndoo's involvement with Victim C and the Springville shooting must be viewed in the context of the proof that it claims exists that Mr. McIndoo was a supplier of firearms to the KMC. There is no dispute that Mr. McIndoo owned, possessed, and handled a significant number of firearms – over 15 – during the relevant time period.[9] There is also no dispute that before Mr. McIndoo was promoted to a so-called "full patch" member of the KMC at the end of 2009, he stored ten firearms at the KMC West Side Chapter clubhouse. On or

---

[8]   During the appearance before this Court on August 29, 2016, defense counsel denied that the visit to Mr. McIndoo's home caused him to leave the KMC, suggesting that Mr. McIndoo's decision to leave had been made beforehand. However, in his written submission to this Court, Defendant stated as follows:

> Sean was surprised that the members showed up at his home demanding the money and the books and was unsettled by it. He had grown frustrated and fed up with the KMC in general and the direction it was headed.
> *Sean decided right then to resign from the KMC.* He gave the members his patch and all of his other KMC paraphernalia. He turned over the Nomad books and the remaining money to them. As of that point, he was no longer a member of the KMC.

(Dkt. 251-1 at 15 (emphasis added)).

[9]   Mr. McIndoo testified that between 2003 and the date of his arrest, he had possessed, sold, or handled over 15 firearms. (Dkt. 168 at 105). During the appearance before the Court on August 29, 2016, the Government contended that based on the additional information supplied through Defendant's Exhibit A, it appeared that Defendant had possessed, sold or handled at least 19 firearms.

about May 9, 2009, these firearms were seized by the Buffalo Police Department in connection with an unrelated incident, and Mr. McIndoo ultimately retrieved the firearms a couple months later.  Toward the end of 2009, Mr. McIndoo went from "striker" status within the KMC to "full patch" member, and the Government contends that his promotion was related to his supplying firearms to the organization.

Mr. McIndoo denied these allegations, and proffered that he owned firearms because he has been a hunter since a young age; the firearms were being kept at the KMC clubhouse in 2009 at his parents' request because family was visiting his parents' home; and in 2010 he filed for bankruptcy and as a result, divested himself of these firearms. (Def. Ex. A).  Mr. McIndoo testified that at the time he was arrested, he owned no handguns and just one rifle.  (Dkt. 168 at 101, 103).

According to the Government, Mr. McIndoo also supplied drugs to the KMC.  The Indictment charges various counts related to drug trafficking and the possession of firearms in furtherance of drug trafficking, including counts 45 and 46 charged against Mr. McIndoo.  According to the Pretrial Services Report (dated March 22, 2016), Mr. McIndoo stated as follows with respect to illegal drug use:

> According to Mr. McIndoo, he began using marijuana in 2003.  He noted he uses this substance daily, and last used it on March 21, 2016.  He also noted he uses cocaine approximately twice each month and last used this substance approximately two weeks ago.

Mr. McIndoo denies that he indicated he was using marijuana daily since 2003, although admits using it daily at the time of his arrest because it helps him with his mental health

condition. Mr. McIndoo similarly denied any regular use of cocaine, instead proffering that it was rare and sporadic.

The Government represented that there is sworn testimony from at least one witness, as well as several interviews with witnesses who are expected to testify at trial, that Mr. McIndoo sold cocaine to other KMC members and transported cocaine across state lines. The Government represented that a witness provided sworn testimony that Mr. McIndoo sold him cocaine in early 2014 in Florida. Mr. McIndoo denied selling illegal substances, although there is no dispute that he used illegal drugs.

The Government seized upon Mr. McIndoo's admissions concerning illegal drug use to advance its argument that Mr. McIndoo possessed firearms illegally. ATF Form 4473, which must be completed for the purchase of a firearm in any state, asks, among other questions, whether the purchaser is "an unlawful user of, or addicted to, marijuana, or any depressant, stimulant, narcotic drug, or any other controlled substance?"[10] (see, e.g., Gov't Ex. 3, 4, 7). During the detention hearing before Magistrate Judge Roemer, Mr. McIndoo was questioned on this subject and repeatedly insisted that on the particular

---

[10]     The ATF Form 4473 also contains the following question: "Have you ever been adjudicated mentally defective *(which includes a determination by a court, board, commission, or other lawful authority that you are a danger to yourself or to others or are incompetent to manage your own affairs)* **OR** have you ever been committed to a mental institution?" (see, e.g., Gov't Ex. 7 (emphasis in original)). Although the Social Security Administration has determined that Mr. McIndoo is disabled due to his mental condition and therefore unable to engage in gainful employment, it is not clear that this would have required an affirmative response to this question. For purposes of this motion, the Court assumes that Mr. McIndoo would not have been required to answer that question in the affirmative.

dates when he purchased firearms, he had not been using marijuana or any other illegal

substance.  (*See* Dkt. 168 at 85-89).

During his direct testimony at the detention hearing before Magistrate Judge

Roemer, Mr. McIndoo testified as follows:

> Q    In 2006 when you purchased those weapons in Buffalo or in this
> area, were you on drugs at that time?
>
> A    I was not.  I have had an on again off again problem with marijuana
> ever since I became disabled, and at that time I was not using
> marijuana.
>
> Q    Were you using cocaine?
>
> A    No, no, I didn't start using cocaine until 2010.

(*Id.* at 64:21–65:2).

Then, in connection with the purchase of a firearm on June 12, 2013, Mr. McIndoo

testified as follows on cross-examination:

> Q    Now, at that point in time you were – you were using marijuana?
>
> A    Incorrect.
>
> Q    Okay.  So in your Pretrial Services interview you indicated to them
> that you began using marijuana in 2003, correct?
>
> A    That's correct.
>
> Q    And you indicated on direct that you began using marijuana
> sometime after the psychotic break in 2002, fair?
>
> A    Right.
>
> Q    And I think you indicated that there were times when you used it and
> times when you didn't, correct?
>
> A    That's correct.

Q      Now, is it your testimony that you used it between 2003 and 2013?

A      Off and on, yes.

Q      Okay.   But on the day that you purchased this gun it's your testimony you were not a marijuana user?

A      Yes, that's correct.

Q      When they asked you the question on the form did you say yes, off and on?

A      No.

Q      You checked no?

A      I checked no at that time.

(*Id.* at 85:4–86:1).

Then, in connection with the one firearm that Mr. McIndoo testified he owned at the time of his arrest (a rifle), he testified on cross-examination as follows:

Q      Mr. McIndoo, you indicated at the time of your arrest you had one rifle –

A      That's correct.

Q      – in your possession, correct?

A      That's correct.

Q      That's March 22nd, 2016?

A      Yes.

Q      In that time period you would have been using marijuana, correct?

A      I didn't use marijuana at the time that I purchased the rifle in November.

(*Id.* at 104:10-104:20).   Magistrate Judge Roemer concluded that Mr. McIndoo's testimony that he was not using marijuana at the time of the gun purchases was not credible. (Dkt. 102 at 6).

### 3.   Murders of Paul Maue and Daniel "DJ" Szymanski

The most serious charge in the Indictment relates to the murders of two KMC members, Paul Maue and Daniel "DJ" Szymanski, during the early morning hours of September 6, 2014.   Mr. Maue and Mr. Szymanksi were murdered execution-style outside a KMC clubhouse in North Tonawanda, and co-defendant Andre Jenkins has been convicted of the murders in New York State court.   Although Mr. McIndoo is not specifically named in the Indictment as having been involved with the murders, the Government proffered evidence that Mr. Maue had tucked into his waist band at the time of his death a firearm that was supplied to him by Mr. McIndoo.   (*See* Gov't Ex. 8, 9). The firearm had been purchased by Mr. McIndoo on June 12, 2013, in Daytona Beach, Florida.  (Gov't Ex. 7).

Mr. McIndoo did not deny providing the firearm to Mr. Maue, contending that he legally sold it to him when he believed Mr. Maue was going to be relocating to Florida.

The Government also proffered evidence of alleged telephone communications between Mr. McIndoo and Mr. Jenkins in the days following the murders.   Specifically, phone records offered by the Government showed, among other things, a voicemail message left by Mr. McIndoo with Mr. Jenkins on September 6, 2014, at approximately 7:50 PM, followed almost immediately thereafter by a text message from Mr. McIndoo to Mr. Jenkins, and then a returned call from Mr. Jenkins to Mr. McIndoo at approximately

8:21 PM, which lasted over eight minutes. (Gov't Ex. 1).[11] In addition, two days later, on September 8, 2014, at approximately 7:06 PM, there is a call from Mr. McIndoo to Mr. Jenkins that lasted almost 14 minutes. (*Id.*).

Mr. McIndoo did not deny making the phone contact, although he denied that it involved anything nefarious. Mr. McIndoo proffered that the reason he contacted Mr. Jenkins was that he was upset that his friend, Paul Maue, had been murdered, and he had heard that Mr. Jenkins was the killer, so he called Mr. Jenkins to confront him about it, whereupon Jenkins denied being the shooter.

Through its motion to supplement the record, the Government has presented additional evidence of a link between Mr. McIndoo and Mr. Jenkins. Specifically, when Mr. Jenkins was arrested in November 10, 2014, in the state of Georgia, he possessed Mr. McIndoo's KMC Nomad business card with Mr. McIndoo's telephone number. (*See* Dkt. 295-2 & 295-3). The Government cites to the multi-state travels by Mr. Jenkins in the months following the murders, and the fact that he nonetheless kept Mr. McIndoo's phone number in his possession during his travels to "ensure[] that he would be able to reach Kingsmen Nomad/defendant Sean McIndoo from any phone, in any state. . . ." (Dkt. 295 at 4). The Government argues that Mr. McIndoo downplayed his relationship

---

[11]   In addition to the referenced voice mail, text message, and telephone call on September 6, 2014, between Mr. McIndoo and Mr. Jenkins, Government Exhibit 1 also appears to reflect a thirty-second telephone call on September 6, 2014, from Mr. McIndoo to Mr. Jenkins at the exact same time as the voicemail message. It is not clear whether this was a separate telephone call or whether it is part of the call resulting in the voice mail message.

with Jenkins when interviewed by the FBI in November 2015[12] and that this evinces his

consciousness of guilt. (*Id.*).

4.     <u>Mr. McIndoo's Relationship with KMC</u>

In 2006, when working in motorcycle sales through a return-to-work program

sponsored by the Government, Mr. McIndoo became acquainted with the KMC. (Dkt.

168 at 61). Mr. McIndoo testified that he became a member of KMC in 2009 (*id.* at 61),

and that he left the organization twice – in 2010,[13] when he left for a little less than a year

(*id.* at 63), and then again in April 2014 "when they showed up to my house uninvited,"

(*id.* at 64). During his tenure, Mr. McIndoo was a Nomad, serving as Treasurer at one

point, and at different times he also was a member of at least one chapter in Buffalo and

one chapter in Florida.

Surveillance conducted by the FBI revealed Mr. McIndoo's presence at the KMC

Daytona Chapter clubhouse almost two years after he had purportedly left the KMC – on

January 4, 2016. (Gov't Ex. 2, 2a, 2b, 14). The Government also presented evidence of

alleged phone contact by Mr. Pirk to Mr. McIndoo in March 2016, although the evidence

consists of three separate calls on March 6, 2016, lasting no more than one minute, and

---

[12]    According to the FBI's report of its interview with Mr. McIndoo on November 5, 2015, prepared on an FD-302 form: "MCINDOO advised he knew ANDRE JENKINS and had thought he was a nice guy, however added that he (MCINDOO) apparently didn't know him as well as he had thought he did." (Gov't Ex. 11).

[13]    Defendant testified that he first left KMC in 2010, although in his written submission to this Court in support of his motion to revoke the detention order, he represents that he left in April 2011, and then rejoined in October 2011. (Dkt. 251-1 at 14).

there is no evidence that there was actually any communication between Mr. Pirk and Mr. McIndoo.

Mr. McIndoo testified that he was no longer a member of the KMC after April 2014, but he "maintained some friendships." (Dkt. 168 at 64). Moreover, Mr. McIndoo's father testified and corroborated Mr. McIndoo's testimony that in April 2014, he turned in his colors and other KMC items when some members unexpectedly arrived at his parents' house during dinner time.

Magistrate Judge Roemer concluded that it was not credible that Mr. McIndoo quit the KMC in April 2014. (Dkt. 102 at 6).

## C.   HISTORY AND CHARACTERISTICS

Mr. McIndoo is 43 years old. (Dkt. 168 at 59). He grew up in the Buffalo area and attended Clark University in Worcester, Massachusetts, achieving a degree in ecology and evolutionary biology. (*Id.* at 60). After college, he had challenging full-time employment in the pharmaceutical industry, but Mr. McIndoo testified he became disabled when the "[t]ravel, stress and time away from my wife . . . threw me into a depression that resulted in a psychotic break." (*Id.*). In 2002, Mr. McIndoo qualified as disabled under the Social Security Act, and then his wife divorced him and he moved home with his parents. (*Id.* at 61).

Mr. McIndoo has been diagnosed with bipolar disorder, depression and anxiety. He takes a number of prescription medications for his condition. Mr. McIndoo had some disruptions in the supply of his necessary medications while in custody, although it now appears that he is at least receiving all of his necessary *prescription* medication to treat

his mental health issues. (*Compare* Gov't Ex. 15 *with* Dkt. 255). There was a focus during the appearances before this Court as to whether Mr. McIndoo's mental health history should be considered in connection with this Court's detention decision. Magistrate Judge Roemer cited it as a basis for his determination that Mr. McIndoo was a flight risk. (Dkt. 102 at 4).

According to the defense proffer, Mr. McIndoo spends the winters in Florida because he finds it helpful mentally to be in a sunnier climate because he has a Vitamin D deficiency. (Dkt. 168 at 53-54).

Mr. McIndoo's financial resources appear to be fairly limited. Although he does own a valuable RV and truck, Defendant testified that he purchased these items through a settlement he received when he was injured by a drunk driver in November 2012. (*Id.* at 102).

Mr. McIndoo's criminal history is limited, and his one arrest relates to an insurance fraud incident that was initially charged as a felony, but resulted in a plea to a charge of disorderly conduct (a violation). The charge involved Mr. McIndoo's false report in March 2010, that a firearm had been stolen. Mr. McIndoo filed an insurance claim and received $1,149.40 through his parents' homeowners' policy for the allegedly stolen firearm. (Gov't Ex. 10). When confronted one year later by an officer with the Kenmore Police Department, Defendant admitted that the police report and insurance claim were false. Mr. McIndoo told the Kenmore Police Department that the firearm was stolen from him in September 2009, by a co-defendant in this case, Filip Caruso. (*Id.*). In March 2011, Mr. McIndoo told the Kenmore Police Department that he did not report

the gun stolen immediately because he was trying to get it back from Mr. Caruso, but when he was unsuccessful, he reported it stolen.   Apparently, in September 2009 – several months before Mr. McIndoo initially reported the gun as stolen – it was recovered by law enforcement during a drug arrest in Buffalo, New York. (*Id.*).

> Magistrate Judge Roemer concluded:
>
> At the hearing, the defendant admitted that the police report and insurance claim were false, but he was afraid to confront Caruso about returning the weapon.  He stated that he reported the gun stolen to police in the event that if sometime in the future, the gun were to be used for some unlawful purpose, he would not be held responsible.  The Court found this testimony suspect.  It appears more likely that Caruso refused to return the gun and the defendant decided to make a false insurance claim simply to recover the money he paid for the gun, as well as money for other items that were not taken.

(Dkt. 102 at 6).

The Government argued that Mr. Caruso was likely never involved with the theft of the firearm (he has apparently denied any involvement), and in 2011, when Mr. McIndoo blamed Mr. Caruso, he was likely just using him as a scapegoat since at the time, Mr. Caruso was on the outs with KMC.

### D.   **NATURE OF DANGER**

The Government argues that based upon Mr. McIndoo's alleged past conduct, and involvement in the KMC, including the Springville shooting and the visit to Victim C's house, Mr. McIndoo "knows who he was targeting, and those intended victims/targets could be in danger if the defendant is released." (Dkt. 266 at 12).  Defendant argues that, at best, the evidence of any alleged dangerous activity dates back some three years, and

there is no basis to conclude that he poses any type of present danger if released with appropriate bail conditions.

## E.   ANALYSIS OF § 3142(g) FACTORS

In addition to the rebuttable presumption of flight and danger, weighing in favor of Defendant's detention without bail is the fact that he is facing very serious charges, his potential imprisonment range is significant, and the evidence regarding his involvement with the Springville shooting and incident at Victim C's house appears very strong.  In addition, Defendant has a history of illicit drug use, and the evidence that he was a supplier of illegal drugs appears to be fairly strong.

Furthermore, Defendant has had significant involvement with a substantial number of firearms.  Although Defendant contends that he possessed all of these weapons legally, it is striking that his firearms repeatedly ended up in the possession of others – one of the firearms was possessed by Mr. Maue at the time of his death; another was discovered during a drug arrest in 2009 (the firearm that was subsequently the subject of Defendant's insurance fraud); and in 2009, ten of Mr. McIndoo's firearms were seized by the Buffalo Police Department from the KMC West Side Chapter clubhouse.  Even if all of Mr. McIndoo's explanations concerning these events are accepted as true, the sheer volume of instances where firearms belonging to Mr. McIndoo wind up in the hands of others is disconcerting.  At the very least, it supports the Government's argument that Mr. McIndoo was a supplier of firearms to the KMC.

The Court has considered the fact that Defendant has strong ties to the Buffalo community, and he has a loving and supportive family who appear ready and able to take

on various responsibilities if he is released. Although Defendant's lifestyle of living in Florida during the winter months could be characterized as transient, the Court accepts Defendant's proffer that this is dictated by Defendant's mental health issues and the need to be in a sunnier climate during the winter. Moreover, the Court agrees with Defendant that his mental health does not dictate the result here. It appears fairly evident to the Court that Defendant recognizes the need to maintain his medications, and there is no evidence in the record that Defendant's mental health issues, standing alone, increase his flight risk or danger. Nonetheless, Defendant's admitted daily use of marijuana, as well as his use of cocaine, must be considered in the context of Defendant's mental health condition. In other words, the illicit use of drugs, particularly cocaine, can influence the behavior and mental status of a healthy individual, and that impact is likely only compounded when an individual suffers from mental health issues and takes a number of prescription medications, as does Mr. McIndoo.

The Court recognizes Defendant's argument that there is no proof of any violent activity on his part since 2013, and it also takes into consideration the fact that he was aware of this investigation since at least November 2015, when he was interviewed by the FBI, and yet made no effort to flee. The Court also is satisfied that the scenario described by Mr. McIndoo involving his return of his KMC colors in April 2014, as corroborated by his father, occurred. However, regardless of whether Mr. McIndoo was a so-called "full patch" member after April 2014, it is clear that he maintained his connections with various KMC members after that date, including Mr. Jenkins.

Like Magistrate Judge Roemer, the Court has considered Mr. McIndoo's various inconsistencies on different matters presented to the Court. Mr. McIndoo admitted that he submitted a false insurance claim regarding the allegedly stolen firearm. While the Court is not in a position to resolve whether Mr. Caruso stole the firearm or instead Mr. McIndoo fabricated his involvement, there is no dispute that Defendant lied to law enforcement and the insurance company when he initially reported the incident.

In addition, in November 2015, Mr. McIndoo denied to the FBI that he knew any individual named Jack Wood, even though the credible evidence in the record indicates that Mr. McIndoo attended a party at Mr. Wood's house on August 3, 2013; travelled in Mr. Wood's van to the Springville Chapter clubhouse; and was at least present when gunshots were fired from that van at former KMC members. Similarly, the Court views as suspect Defendant's explanation that he sold a firearm to Mr. Maue because he believed Mr. Maue was moving to Florida (and therefore Mr. Maue would not be required to register the pistol in New York).

However, the most troubling inconsistency relates to Defendant's denial of illegal drug use when he purchased various firearms over the years. Defendant's potentially false statements about his lack of drug use on the ATF 4473 forms, while problematic, are not as concerning as Defendant's incredible testimony before Magistrate Judge Roemer. According to Mr. McIndoo, even though he was a daily user of marijuana at the time of his arrest and had been smoking it for over a decade, he just happened to not be using marijuana or any other illegal drugs on the dates that he purchased the numerous firearms that were in his possession. That testimony is not credible. Like Magistrate

Judge Roemer, the Court lacks confidence that Mr. McIndoo would abide by conditions of release set by the Court given his apparent willingness to provide false testimony to the Court.

Finally, the entire situation involving Mr. Jenkins weighs in favor of detention. Defense counsel argued to this Court that it would be abnormal not to try to investigate the killing of one's friend.  True, but what the Court cannot reconcile is Mr. McIndoo's apparent decision to reach out to the person identified as the killer.  It is not plausible that Mr. McIndoo, whose alleged fear of Mr. Caruso manifested itself into the filing of a fraudulent insurance claim, suddenly became emboldened when Mr. Maue was murdered and decided to confront the alleged killer on the day of the murder – and then had a further conversation with the alleged killer two days later.  The Court does not view this as a credible explanation for the reason for the communication between Mr. McIndoo and Mr. Jenkins.  That conclusion is only further buttressed by Mr. Jenkins' possession of Mr. McIndoo's KMC business card at the time of his arrest.

In sum, on the risk of flight, the Court agrees with Magistrate Judge Roemer that Mr. McIndoo has rebutted the presumption of detention with respect to his risk of flight. (Dkt. 102 at 3).  Moreover, for many of the same reasons expressed by Magistrate Judge Roemer (*Id.* at 3-4), including consideration of the rebuttable presumption in this case, the significant penalties faced by Defendant, his illegal drug use, and Mr. McIndoo's credibility issues, the Court agrees that the Government has proven by a preponderance of the evidence that there is a risk that Mr. McIndoo will not appear as required if released.  However, there may be conditions that could be put in place that would

reasonably protect against the risk of flight, including but not limited to the proposed financial package offered by Defendant of $250,000, secured by his parents' property and cash. (Dkt. 251-1 at 29). The Court believes that Mr. McIndoo would have a significant incentive not to flee based upon a sufficient bail package and that he would not be inclined to jeopardize his parents' and other family members' financial security through his nonappearance. Moreover, the Court questions whether Mr. McIndoo would have either the financial resources or mental fortitude to flee the Court's jurisdiction.

Nonetheless, the Court need not resolve whether a bail package exists to reasonably protect against the risk of flight, because Mr. McIndoo has not rebutted the presumption of dangerousness, and even if he had, the Court finds that the Government has proven by clear and convincing evidence that that there are no conditions that would reasonably protect against the danger posed to others and the community by Mr. McIndoo if released. No bail package, even one secured by his parents' assets, could protect against Mr. McIndoo's danger, particularly in view of Mr. McIndoo's history of drug use, his history with respect to firearms, the strength of the evidence regarding his involvement with violent activity on the part of KMC, his continuing relationship with various KMC members, and the numerous credibility issues regarding Mr. McIndoo that have been raised in the record before the Court.

## CONCLUSION

For the foregoing reasons, Defendant's motion to revoke the magistrate judge's detention order (Dkt. 251) is denied.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:      September 19, 2016
            Rochester, New York